IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-01582-WDM-KLM

PIONEER NATURAL RESOURCES USA, INC.,
a Delaware corporation,

 Plaintiff and Counterclaim Defendant,

v.

HARWEST INDUSTRIAL MINERALS CORPORATION, a Colorado corporation,
ALLAN G. PROVOST, an individual,
HARRISON WESTERN CONSTRUCTION CORP., a Colorado corporation,
HW PROCESS TECHNOLOGIES INC., a Colorado corporation, and
KENNETH A. BRUNK, an individual,

 Defendants and Counterclaimants,

v.

STEVEN HERRON, an individual, and
JAY STILL, an individual,

 Third Party Defendants,

v.

ERIC BRUNK and
DON MCCARTHY, individuals

 Third Party Defendants.

## ANSWER, COUNTERCLAIMS, THIRD-PARTY CLAIMS AND JURY DEMAND OF STEVEN HERRON

 Steven Herron, through his undersigned counsel, answers the Third Party Complaint herein as follows, and submits the following Counterclaims against Third Party Plaintiff Harwest Industrial Minerals Corporation, and Defendants Kenneth Brunk and Allan Provost, and the following Third-Party Claims against Eric Brunk and Don McCarthy:

# ANSWER

1. Paragraphs 1, 3, 4, 6, 7, 8, 14, 55, and 73 are admitted.

2. Paragraphs 13, 15, 18, 19, 20, 21, 23, 24, 25, 27, 31, 32, 33, 34, 35, 36, 37, 40, 41, 42, 43, 44, 45, 48, 51, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 69, 70, 71, 72, 75, 78, 81, 85, 86, 87, 116, 117, 118, 122, 123, 134, 135, 136, 137, 139, 140, 141, 142, 145, 147, 148, 149, 151, 152, 153, 154, 155, 157, 158, 159, and 160 are denied.

3. With respect to the allegations contained in paragraphs 2, 5, 10, 17, 22, 38, 39, 46, 47, 49, 50, 56, 71, 76, 77, 80, 83, 84, 88, 89, 90, 91, 144, 146, and 161 Herron does not have information sufficient to form a belief as to the truth or accuracy of the matters asserted in said paragraphs and, therefore, denies them.

4. With respect to paragraphs 26, 29, 64, 68, 79, 82, 92, and 133 Herron affirmatively alleges that the documents and instruments referred to in said paragraphs speak for themselves, and otherwise denies all of the allegations of said paragraphs.

5. With respect to the allegations of paragraphs 115, 120 and 121, Herron states that said paragraphs contain legal conclusions that require no response under the Federal Rules of Civil Procedure. Heron admits that he was an employee and the president of HIMC.

6. With respect to the allegations of paragraphs 94, 95, 96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 111, 112, 113, 125, 126, 127, 128, 129, 130, and 131, Herron states that said paragraphs contain factual allegations and claims for relief against parties other than himself and so no response by him is required but, to the extent any such allegations concern any conduct of Herron or any conduct for which he is claimed to be responsible, they are denied.

7. With respect to paragraphs 162 and 163, Herron states that said paragraphs do not contain any factual allegations and, therefore, no response is due under the Federal Rules of Civil Procedure.

8. With respect to paragraphs 9, 11, 12, 16, 28, 30, and 74, all of the allegations of said paragraphs are denied and, furthermore, Herron states that the averments in said paragraphs such as "this case revolves around Pioneer's sabotage," "managerial chaos and financial paralysis," "nefarious plan," "holding HIMC and Legacy hostage financially," "managerial coup attempt," and the assertion that HIMC has "bent over backwards" are not factual allegations susceptible to specific admission or denial.

9. With respect to paragraphs 93, 103, 110, 114, 119, 124, 132, 138, 143, 150, and 156, the responses above are hereby incorporated.

10. Any allegation not specifically admitted above is hereby denied.

## AFFIRMATIVE DEFENSES

1. All of Third Party Plaintiff's claims against Herron are barred by the doctrine of estoppel.

2. All of Third Party Plaintiff's claims against Herron are barred by the doctrine of waiver.

3. All of Third Party Plaintiff's claims against Herron are barred by the doctrine of unclean hands.

4. All of Third Party Plaintiff's claims against Herron are barred by the doctrine of release.

5. Third Party Plaintiff has failed to mitigate its damages, if any.

6. Some or all of Third Party Plaintiff's claims against Herron are barred by the Third Party Plaintiff's lack of standing to prosecute such claims.

7. Some or all of Third Party Plaintiff's claims against Herron are barred because they constitute derivative claims that the Third Party Plaintiff is not entitled to pursue for its failure to follow the specific procedures for prosecution of derivative claims.

8. Third-Part Plaintiff's claim for breach of contract is barred because Third-Party Plaintiff and other Defendants prevented and substantially interfered with Herron's performance of his contractual obligations.

9. All of Third Party Plaintiff's claims against Herron fail to state a claim upon which relief can be granted.

10. At all relevant times, Herron was acting on behalf of the entity by which he was employed, and within the course and scope of his employment.

## COUNTERCLAIMS and THIRD-PARTY COMPLAINT AGAINST HARWEST INDUSTRIAL MINERALS CORPORATION, ALLAN G. PROVOST, KENNETH A. BRUNK, ERIC BRUNK AND DON MCCARTHY

For his Counterclaims against Third Party Plaintiff Harwest Industrial Minerals Corp, and Defendants Allan Provost and Kenneth Brunk, and his Third-Party claims against Eric Brunk and Don McCarthy, Third Party Defendant, Steven Herron ("Herron"), alleges as follows:

1. In the summer of 2005, Herron began discussions with representatives of the Harrison Western Group of Companies, Kenneth A. Brunk ("Brunk"), and Allan G. Provost ("Provost") about possible opportunities in the industrial minerals industry.

2. Herron introduced Brunk and Provost to the current opportunity for the production of industrial sand.

3. Brunk and Provost decided to avail themselves of the opportunities introduced by Herron by forming Harwest Industrial Minerals Corporation ("HIMC").

4. On information and belief, Harrison Western Mining Corporation ("HWMC") is the controlling shareholder of HIMC. Provost and Brunk are the principal shareholders of HWMC.

5. Brunk was President and Chief Executive Officer of HWMC, and CEO of HIMC.

6. Provost was Chairman of the Board of directors of HIMC.

7. At all relevant times, Brunk controlled the operations of HIMC.

8. Harrison Western Construction Corporation ("HWCC") is an affiliate, and under the control, of Provost and Brunk.

9. The parties agreed that Herron would serve as President of HIMC on the following terms:

(a) Herron would receive a base salary of $125,000;

(b) Herron would receive a ten percent profit and appreciation interest in HIMC;

(c) The ten percent profit and appreciation interest would vest over a period of five years;

(d) Herron and his key employees would receive ten percent of the net profit before tax as an incentive bonus from HIMC for achieving eighty percent of budgeted net profit in any year, which would be distributed according to Herron's recommendations; and

(e) Herron would receive other miscellaneous benefits.

10.  In 2006, HIMC approached Pioneer Natural Resources, USA, Inc. ("Pioneer") to see if it had an interest in participating with HIMC in the exploitation of the opportunity developed by Herron.

11.  Pioneer and HIMC entered into a transaction whereby Legacy Resources Company LLC ("Legacy"), a limited liability company, would be jointly owned by Pioneer and HIMC.

12.  HIMC would own an 80.5% interest in Legacy and Pioneer would own the remaining 19.5%.

13.  The Operating Agreement between HIMC and Pioneer initially appointed HIMC as the Manager.

14.  The Operating Agreement created a Management Committee comprised of two members, each appointed by HIMC and Pioneer, which Management Committee consisted of Provost and Brunk (appointed by HIMC), Jay P. Still and Dennis R. Carlton (appointed by Pioneer).

15.  The Operating Agreement required unanimous consent of the members for various transactions including, without limitation, incurring debts in excess of $100,000 and entering into contracts or other obligations exceeding $50,000.

16.  Approximately $21 million was raised by Herron, and pursuant to the business plan of Legacy, a plant was constructed in Nance County, Nebraska.  HIMC served as general contractor.

17.  HIMC entered into a non-arms length contract with HWCC signed by Brunk for the construction of the plant.

18. Legacy's only project is the Nance County plant.

19. As president of HIMC, Herron disclosed the location of additional sand deposits in Colorado and Arizona that had been identified by Herron prior to his employment at HIMC.

20. Herron also brought customers to HIMC who had previously been identified by Herron.

21. Prior to his employment at HIMC, Herron formed an industrial minerals company known as Performance Minerals, LLC ("Performance"). Performance is a Colorado limited liability company of which Herron and his wife are the only two members.

22. The purpose of Performance is to broker the sale of industrial sand.

23. HIMC, through Brunk and Provost, indicated a desire to acquire Herron's interest in Performance. Although an assignment was drafted, it was never executed.

24. Herron never received consideration for Performance.

25. Throughout Herron's tenure at HIMC, Herron continued to operate and build Performance into a successful ongoing concern.

26. Performance was and is a separate entity from HIMC and has no legal relationship to any of the Harrison Western Group of Companies.

27. All of Performance's cash flow was used as working capital for HIMC.

28. In early April, 2007 the Director of Finance, Jayson Boydstun of HIMC informed Herron that he had learned from the Controller for HWCC that $1,000,000 had been transferred from a Legacy Resources Company account without proper approvals of the Management Committee as required by the Operating Agreement.

29. Herron informed Brunk of this irregularity the same day.

30. Brunk told Herron that the $1,000,000 which had been transferred was a loan between Legacy and HWCC.

31. Brunk's statement was a lie.

32. Brunk also advised Herron that day that the transaction was appropriately "papered."

33. This statement by Brunk was a lie.

34. Upon information and belief, the $1,000,000 was used to pay non-Legacy related debts of affiliates of Brunk and Provost.

35. On April 18, 2007, Herron notified the general counsel of HIMC of his concern regarding the $1,000,000 transfer and both he and the general counsel recognized that the transaction violated the Operating Agreement of Legacy.

36. In early May of 2007, the general counsel of HIMC specifically advised Brunk and Provost that the transaction was inappropriate, not authorized by the Operating Agreement, and could lead to civil and potentially criminal liability, was without consideration, and was otherwise improper.

37. Provost called Herron into his office and told him to "get on board" with the transaction and threatened Herron to get the accountant and attorney "under control."

38. On May 8, 2007, Herron received an invoice for his approval of the $1,000,000 for "advance payment on Phase II." This invoice was dated April 30, 2007, approximately two weeks after Brunk had specifically represented to Herron, falsely, that the transaction had been appropriately approved and documented.

39. The invoice was signed by Brunk's son, Eric Brunk, on May 8, 2007.

40. There was in fact no basis whatsoever for any invoice from HWCC to Legacy for "Phase II" as represented by Eric Brunk as there was no schedule, scope, budget, or Management Committee approval for Phase II of the project.

41. Submission of the invoice was a retroactive attempt by Eric Brunk, his father, and others associated with HWCC, to loot the assets of Legacy, for their personal benefit.

42. On May 9, 2007, Herron submitted the invoice to Brunk and advised him that this was not an appropriate transaction. Brunk told Herron that the invoice was for a loan, not a prepayment as indicated on the invoice.

43. Herron reminded Brunk that any such loan would require Management Committee approval and Herron refused to sign or otherwise process the invoice.

44. Brunk and Provost engaged in a series of actions between May 16th and May 21st designed to "paper" and cover up the $1,000,000 transaction.

45. On May 21, 2007, Herron received a memo from Jayson Boydstun stating that he could not reconcile Legacy's bank account and that there was an unauthorized transfer of $1,000,000 to HWCC.

46. Brunk and Provost made additional unauthorized payments from Legacy to or for the benefit of some or all of the Defendants and Third Party Plaintiffs, in an amount to be proved at trial.

47. Brunk and Provost repeatedly sought Herron's approval of fraudulent invoices which did not represent appropriate charges to the project and which were inconsistent with the requirements of the Operating Agreement for Legacy.

48. Herron refused to approve the fraudulent invoices.

49. In June, 2007 Brunk and others, including HIMC's new president, Don McCarthy, demanded that Herron falsify accounts payable reports requested by Pioneer, which he refused to do.

50. Provost and Brunk, with the assistance and cooperation of Eric Brunk, engaged in a practice of manufacturing and submitting unapproved invoices and unauthorized payments which constitute misappropriation of funds for their own personal use and adverse to the interests of Legacy and HIMC.

51. Provost and Brunk grossly and fraudulently mismanaged the development, construction, and operation of the Legacy project including, but not limited to, fraudulent sales of used equipment, the use of sand samples from a different location in a different state to design project facilities, grossly inadequate design, faulty process methodology and mining methods, non- arms-length transactions with other affiliated entities and other misconduct leading to the recordation of substantial liens against the project, and to its failure to meet any of its projected performance.

52. Pioneer became aware of the defalcations and misconduct of Brunk, Provost and others and confronted them about, among other things, the transactions mentioned above.

53. On June 15, 2007, HIMC tendered its resignation as a Manager of Legacy, which resignation was reaffirmed on July 9th in a "Written Consent."

54. Herron was forced to resign as president of HIMC on June 22, 2007 because he was unwilling to approve fraudulent invoices or create fraudulent financial reports as demanded by Brunk, McCarthy and others.

55. Pursuant to the parties' agreement, at the end of 2005, Herron was entitled to receive a bonus equal to 10% of net profit before tax, and a 10% profit sharing. He never received the bonus.

56. Pursuant to the Written Consent, Herron became President of Legacy as of July 9, 2007.

57. Since that time, all actions taken by Herron and all decisions made by him have been on behalf of Legacy, and within the course and scope of his employment.

58. Notwithstanding Herron's selection by both Pioneer and HIMC to act on behalf of Legacy pursuant to the Written Consent, since the time that consent was issued, Brunk, Provost, McCarthy, HIMC, HWCC, and others, have conspired and intentionally acted to interfere with Herron's performance and Legacy's conduct of its business by the following acts, among others:

(a) Caused HIMC and HWCC to sue Legacy, and refused to cooperate in appointing counsel to represent Legacy in proceedings which were critical to its viability;

(b) Provided confidential information of and about Legacy to third parties for the purpose of inducing them to take actions against Legacy;

(c) Utilized its outside counsel, Brownstein Hyatt Farber Schreck to harass Legacy and its management with a barrage of criticism and accusation for the purpose of intimidating and demoralizing Legacy's personnel and interfering with Herron's relationship and prospective relationships with them;

(d) Refusing to support Legacy financially for the purpose of interfering with its prospects for sale or continuing as a going concern;

(e) Encouraging Legacy's critical vendors to stop doing business with Legacy; and

(f) Filing and prosecuting the claims against Herron in this action not for the purpose of protecting or pursuing any valid legal claim but with the intent and purpose of destroying Legacy and Herron.

59. In addition to interfering with Herron's ability to manage the Legacy project, Brunk, Provost and McCarthy have damaged his reputation and interfered with his future employment prospects in the industry by making false and negative statements about Herron's abilities and character, including, on information and belief, statements to third-parties that Herron was a poor manager, was responsible for Legacy's design failures, and that he engaged in fraud and conspiracy.

60. As evidenced by the above, Provost, Brunk, HIMC, HWCC, and others developed and have been attempting to implement a plan to destroy the Legacy project and all of the value that could have been derived therefrom, which would have formed the basis for the profit and appreciation interests granted to Herron in his employment with HIMC.

**First Claim for Relief**
**(Breach of Contract – express or implied against HIMC)**

61. The allegations set forth above are incorporated herein by this reference.

62. Herron and HIMC were parties to a contract for Herron's employment.

63. HIMC performed certain of its obligations under the parties' agreement.

64. Pursuant to the contract, Herron was to receive certain compensation, including bonuses, profit sharing and stock appreciation rights.

65. HIMC has breached the contract by failing to pay Herron all of the compensation to which he is entitled.

66. Herron performed all of his obligations under the contract.

67. To the extent there is no express contract between HIMC, Herron rendered services to HIMC with the reasonable expectation that he would be paid the reasonable value of those services.

68. HIMC requested and accepted the services and expected to pay for them.

69. HIMC has failed to pay the reasonable value of Herron's services.

70. HIMC's breach has damaged Herron in an amount to be determined at trial.

## Second Claim for Relief
### (Unjust Enrichment – against HIMC, Brunk, Provost)

71. The allegations set forth above are incorporated herein by this reference.

72. Upon his employment with HIMC, Herron was responsible for bringing numerous opportunities to HIMC and its principals, including the sand deposits referenced above and customers developed from Herron's previous industry relationships.

73. Herron allowed his company, Performance, to essentially be acquired by HIMC and its cash flow used by HIMC for working capital, without any consideration paid to Herron.

74. Brunk and Provost used the resulting profits for their own benefit or the benefit of their affiliates.

75. The opportunities conferred by Herron constitute a benefit conferred upon and appreciated by HIMC, Brunk and Provost.

76. It would be inequitable for HIMC, Brunk and Provost to retain such benefit without payment to Herron in an amount to be proven at trial.

### Third Claim for Relief
### (Breach of Fiduciary Duty- against HIMC)

77. The allegations set forth above are incorporated herein by this reference.

78. Herron was induced to join HIMC by promises that he would become more than an employee and would receive an equity interest in the company.

79. Relying on these promises, Herron provided valuable information and opportunities to HIMC, including the location of certain sand deposits, Performance, the company he had created, and Herron's customers developed from his previous industry relationships.

80. Prior to entering into their relationship with Herron, Brunk, Provost and their affiliated companies had no knowledge of the opportunities contributed by Herron, HIMC would not have been created without such opportunities.

81. By offering HIMC the opportunities referenced above, Herron conferred confidential information upon HIMC and reasonably placed trust and confidence in HIMC.

82. HIMC invited and accepted Herron's trust and confidence by, *inter alia*, promising to pay for Performance, and promising Herron significant financial opportunity.

83. HIMC represented or agreed to that it would act for Herron's benefit with respect to the opportunities conferred by Herron, and appeared to do so for some period of time.

84. By later undermining and interfering with his performance, by requesting that he approve fraudulent invoices, by destroying the opportunities related to the Legacy project, and usurping Performance's profits without compensation, HIMC breached its fiduciary duties to Herron.

85. Such breach has caused Herron damages in an amount to be determined at trial.

### Fourth Claim for Relief
### (Aiding and Abetting Breach of Fiduciary Duty- against Brunk, Provost, and Eric Brunk)

86. The allegations set forth above are incorporated herein by this reference.

87. Brunk, Provost and Eric Brunk had knowledge of the fiduciary relationship between HIMC and Herron.

88. Brunk, Provost and Eric Brunk knew that HIMC's conduct toward Herron was a breach of its fiduciary duties.

89. Brunk, Provost and Eric Brunk substantially participated in the breach of fiduciary duty.

90. Brunk, Provost and Eric Brunk have therefore aided and abetted HIMC's breach of fiduciary duty.

91. Such conduct has caused Herron damages in an amount to be determined at trial.

### Fifth Claim for Relief
### (Intentional interference With Prospective Business Advantage –against Brunk, Provost, Eric Brunk and Don McCarthy )

92. The allegations set forth above are incorporated herein by this reference.

93. Brunk, Provost, Eric Brunk and Don McCarthy knew of Herron's stock appreciation rights in HIMC and knew of Herron's financial opportunities with Legacy.

94. Through their actions of mismanaging the Legacy project, diminishing its value, deliberately undermining Herron's performance, and disparaging Herron to third parties, Brunk, Provost, Eric Brunk and McCarthy have interfered with Herron's relationship with Legacy, Pioneer, existing and future customers and future prospective employers.

95. Such interference was both intentional and improper, and constitutes an interference with Herron's prospective contractual and business relations and economic advantage.

96. Such interference has caused Herron damages in an amount to be proven at trial.

### Sixth Claim for Relief
### (Indemnification– HIMC )

97. The allegations set forth above are incorporated herein by this reference.

98. HIMC is a Colorado corporation.

99. Herron was the president of HIMC, and has been made a party to this proceeding because he was an officer of the company.

100. Herron is therefore entitled to indemnification pursuant to C.R.S. § 7-109-107.

### Seventh Claim for Relief
### (Abuse of Process – HIMC, Brunk and Provost)

101. The allegations set forth above are incorporated herein by this reference.

102. HIMC, through Brunk and Provost, willfully filed and prosecuted the claims against Herron in this action not for the purpose of protecting or pursuing any valid legal claim, but instead with the intent and improper purpose of harming Legacy and Herron's future employment prospects with Legacy, as well as damaging Herron's reputation in the industry and his future employment prospects.

103. The claims were also filed in retaliation for Herron's refusal to engage in unlawful activities; and his disclosure of the unlawful activities to third-parties, including Pioneer.

104.    HIMC's, Brunk's and Provost's conduct has caused Herron damages in an amount to be proven at trial.

### Eighth Claim for Relief
### (Declaratory Judgment )

105.    The allegations set forth above are incorporated herein by this reference.

106.    Pursuant to the parties' agreement, a "triggering event" for the purposes of receiving stock appreciation rights, includes, *inter alia*, the sale of all or substantially all of HIMC's assets or any other reorganization of HIMC which results in a change in control of the business or assets of HIMC.

107.    HIMC and Pioneer are currently in active negotiations to sell the Legacy project.

108.    There is an actual and substantial controversy between Herron and the Defendants concerning Herron's right to his stock appreciation rights.

109.    Herron requests a declaratory judgment pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201, that he is entitled to his stock appreciation rights upon the sale of the Legacy Project to the extent they are not already conferred upon Herron due to other triggering events.

### JURY DEMAND

Third Party Defendant and Counterclaimant hereby demands a trial by jury on all issues so triable.

WHEREFORE, Steven Herron prays that judgment be entered against Defendant and Third-party Plaintiff, and in favor of Herron, that Herron recover his damages, plus costs and interest, and for such other and further relief as this Court deems just and proper.

Dated this 12th day of September, 2007.

OTTEN, JOHNSON, ROBINSON,
NEFF & RAGONETTI, P.C.

/s/ Darrell G. Waas
Darrell G. Waas, #10003
Patricia C. Campbell, #24495
950 Seventeenth Street, Suite 1600
Denver, CO  80202
Telephone:  303 825 8400
Facsimile:  303 825 6525
waas@ottenjohnson.com
pcampbell@ottenjohnson.com

**ATTORNEYS FOR THIRD-PARTY DEFENDANT**
**STEVEN HERRON**

### CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on September 12, 2007 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

>chuck.kaiser@dgslaw.com
>gale.miller@dgslaw.com
>jamie.jost@dgslaw.com
>sgarnett@bhfs.com
>bkahn@bhfs.com
>jhardy@bhfs.com
>eric.liebman@moyewhite.com

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner indicated by the non-participant's name:

>s/ Barbara A. Jones
>BARBARA A. JONES